**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MICHELE HOGAN,**

      **Plaintiff,**

**vs.**                                             **CASE NO.: 6:04-cv-272-Orl-31JGG**

**THE COUNTRY CLUB OF BREVARD, INC.,**
**d/b/a ROCKLEDGE COUNTRY CLUB,**

      **Defendant.**
_____/

**ORDER**

THIS CAUSE comes before the Court on:

(1) Motion for summary judgment by Defendant The Country Club of Brevard, Inc.,

d/b/a Rockledge Country Club ("Defendant") (Doc. 36, filed May 6, 2005) and accompanying

memorandum of law (Doc. 37), to which Plaintiff Michele Hogan ("Plaintiff") has responded

in opposition (Doc. 51, filed June 6, 2005);

(2) Partial motion for summary judgment by Plaintiff (Doc. 45, filed May 6, 2005) and

accompanying memorandum of law (Doc. 46, filed May 6, 2005), to which Defendant has

responded in opposition (Doc. 52, filed June 6, 2005).

**I.    Background**

Defendant hired Plaintiff in August 1993 as an administrative assistant/accounts

payable clerk for the Rockledge Country Club ("the Club").  (Pl. Dep. at 11.)  She was fired in

October 2003.  Defendant alleges Plaintiff's termination was due to budget constraints.

Plaintiff claims that she was fired, in tandem violations of Florida law, for objecting to

Defendant's practices in remedying a mold problem at the Club and for filing a workers' compensation claim arising out of the injuries allegedly caused by mold.  The Court's jurisdiction over these state law claims hinges on two additional federal claims for technical violations of the Employment Retirement Income Security Act (ERISA).  The facts pertinent to Plaintiff's various claims are discussed below.

*Plaintiff's Retaliation Claims*

During her ten years at the Club, Plaintiff received increasing responsibilities, eventually achieving the position of Assistant Club Manager.  (Pl. Dep. at 13.)  She was supervised by Mitch Fortner, the House Manager responsible for food and beverage and the general maintenance of the clubhouse.  (Id. at 19; Stewart Dep. at 7.)  Fortner also referred to himself as the "COO," or Chief Operations Officer. (Fortner Dep. at 11.)  Fortner in turn reported to John Stewart, Defendant's president at the time of Plaintiff's termination and a past general manager.  (Id. at 11.)  Both men were involved in Plaintiff's termination.

At some point during her time at the Club, Plaintiff noticed that the wallpaper in her office was falling down and that there was black mold behind it.  (Pl. Dep. at 26.)  She also alleges that the wooden window sill in her office was rotting, that she could feel the moisture in the air, and that the building's air return system had a history of problems.  (Id. at 81, 26, 95-96.)  Beginning in 2000, Plaintiff alleges that she began suffering physical symptoms from mold when she was in her office: she had headaches and nosebleeds, her eyes burned, she coughed, and occasionally she felt dizzy.  (Id. at 24.)

In August 2002, Plaintiff verbally complained about the mold in her office to Stewart.  (Pl. Dep. at 26, 32.)  She also complained to Fortner shortly after he was hired in January 2003.

2

(Id. at 31.)  Plaintiff alleged in her deposition testimony: "I was told not to really talk about my case or the mold, and I objected to that because I felt that it was an unsafe – not only an unsafe working environment but an unsafe working environment for the members." (Id. at 65.) Specifically, Plaintiff alleges that Stewart, Fortner, and Joe Motzko, another Board member, told her to keep quiet during separate conversations.  (Id. at 65-66, 93.)  Stewart maintains that he did not talk to Plaintiff about the mold problems.  (Stewart Dep. at 57.)

OSHA advised Defendant on December 16, 2002 that a notice of health hazards had been filed against the Club due to the mold problem.  (Def. Ex. F.)  Plaintiff was not one of the employees who initially contacted OSHA.  (First Am. Compl. ¶ 10.)  OSHA stated that it did not intend to conduct an inspection, but requested that Defendant immediately make necessary repairs to the building.  (Def. Ex. F.)  In February 2003, a cleaning service stripped the wallpaper, applied inhibitor, and applied two coats of primer and two coats of paint in the office.  (Pl. Dep. at 58, Ex. G.)  OSHA never proceeded with an investigation.  (Id. at 81.)[1]

Plaintiff filed a workers' compensation claim on December 2002 for expenses associated with treatment to her sinuses, which she believes was necessitated by injuries caused by the mold.[2]  (Pl. Dep. at 23.)  On January 8, 2003, Defendant's workers' compensation

---

[1] Plaintiff alleges that Andy Fein, the Club's maintenance supervisor, resigned because he did not want to work in the environment.  (Pl. Dep. at 63.)  She also alleges that Billy Heigel, another employee who complained to OSHA, was written off the schedule.  (Id. at 63-64.)

[2] Plaintiff had sinus surgery in 2000 in order to alleviate the inflammation in her sinuses.. (Pl. Dep. at 25.)  Plaintiff also left the Club twice to get her nose cauterized due to nosebleeds.  (Id. at 24.)  Plaintiff's workers' compensation doctor determined that she will continue to have sinus problems and has recommended a second sinus surgery. (Id. at 108, 57.)

carrier acknowledged that Defendant sent a Notice of Injury regarding Plaintiff.  (Def. Ex. H.)

By May 1, 2003, Plaintiff filed a petition for workers' compensation benefits.  (Def. Ex. I, J.)

One or two attempts to mediate her claim failed.[3]  The Judge of Compensation Claims

eventually dismissed Plaintiff's workers' compensation petition and closed her case on October

6, 2003.  (Def. Ex. K.)  Plaintiff filed a second petition for benefits on November 26, 2003.

(Def. Ex. J, L.)  This claim was settled at mediation on December 18, 2003 and the case was

again closed on February 23, 2004.  (Def. Ex. J, M.)

      Fortner fired Plaintiff on October 22, 2003, sixteen days after her first workers'

compensation case was closed.  (Pl. Dep. at 23.)  Fortner testified that "[t]he true reason that

[Plaintiff] was terminated was because of her workman's comp file case."  (Fortner Dep. at 25.)

Recounting Plaintiff's last day, Fortner testified: "I told her that we were making – you know, I

don't know if I really even had a good reason.  I just – I probably said budget cuts or something

to that effect and I just – I had a very difficult time with it, you know."  (Id. at 23.)  Fortner

further stated:

> I know that Mr. Stewart had no intention of letting her go.  He thought very
> highly of her.  I know that, you know.  I know him.  I know his heart.  It just got
> out of hand and one day – well, for a week or so, I know that Michele had been
> getting rumors directly from members, and I know that she had left the Club.
> One time I saw her leave in tears, and I called Mr. Stewart and told him that,
> you know, we had a problem with Michele leaving all the time.[4]  I mean, you
> know, I understood what was going on, and I had called him one morning and I

---

[3] Defendant contends, with references to the Docket Sheet in Plaintiff's workers' compensation case, that there was only one mediation.  (Def. Ex. J.)  Plaintiff testified at her deposition that there were two mediations.

[4] Plaintiff testified that she left work numerous times because she was upset about the rumors or people having private meetings.  (Pl. Dep. at 71.)  Plaintiff also alleges that her current employer and co-employees have been "solicited with information and rumors."  (Id. at 76, 102.)

had discussed her leaving all the time  And I said, you know, that if you want to
get rid of her, then this is the time to do it when we're making the budget cuts.
(Id. at 25-26.)

Fortner stated Stewart called him that afternoon "and agreed that that's what we had to do." (Id.

at 27.)  "I don't think it was his decision alone.  I know that he anguished over this as much as I

anguished over this, you know. . . . I just think that there was enough pressure out there

probably from the board."[5]  (Id.)

Fortner elucidates that there was a potential for the club losing their workers'

compensation insurance because of Plaintiff's claim and that, if this occurred, Defendant would

not be able to afford to participate in the more expensive State workers' compensation

program.  (Fortner Dep. at 47.)  He further explained:

> I know enough about lawsuits that if the cat really got out of the bag and, you
> know, you got some member that, you know, certainly, you know, has a
> problem with their sinuses and, you know, then they hear that the Club has a
> mold issue, then where does that go?  You know, so, yeah, you've got to keep
> this thing contained and get it remediated as fast as possible, and that's exactly
> what we did.  (Id. at 52-53.)

Fortner later backed down on his position that it was his idea to terminate Plaintiff:

> Q: If you're the decision maker, and this is important, and that's the
> basis for the decision, then isn't it true that you terminated Michele because of
> her workers' comp?
> A: No.  No.
> Q: Help me to clarify.

_____

[5] Plaintiff and Fortner contend that the prime instigator of the rumors was Board
member Gene Stevanus, who appeared at her final workers' compensation mediation.  (Pl.
Dep. at 104; Fortner Dep. at 17-19.)  Fortner testified that Stevanus was outraged over
Plaintiff's claim and that he took her personnel file from the office without permission,
returning it two or three months later "noticeably thinner."  (Fortner Dep. at 24, 20-22.)
Fortner also reports that he overheard Stevanus talking about Plaintiff's "educational
qualifications and embezzling money."  (Id. at 17.)

A: That – I mean, that had nothing to do with my thinking on that. Clearly, there was a large percentage of Club members, board members, that wanted her out of there because of what she had done.

Q: With the lawsuit?

A: With the lawsuit. And it was getting out of control. Again, I emphasize that – you know I know that one of the ringleaders was Gene Stevanus. I don't know who the other individuals were. There were of a lot of rumors flying around. All this ugliness was stuff that I had to listen to every single day, you know, after he attended that mediation meeting. I overheard him talking about embezzlement to other members in the men's locker room. It just got to the point where, I mean, something had to happen. She . . .

Q: Well, by terminating her for whatever reason you give her would have had the effect of appeasing all these members and board members –

A: That's exactly right. Yeah, that's exactly right.

Q: -- concerned about her lawsuit?

A: It got out of control. Yeah. Some appeasement had to be made there. That's exactly right.

(Id. at 63-64.)

Fortner testified he did not tell Stewart that Plaintiff's lawsuit was the reason he wanted to fire her. (Id. at 80.)

Plaintiff alleges that even before her termination, Fortner cautioned that: "I should really think about settling my workers' comp case. I really needed to pray long and hard about it because this is going to ruin my reputation in Brevard County and that, you know, that there were already key members saying rumors about me, board members also, and that it would be hard to use Rockledge Country Club as a reference when you have a workers' comp claim." (Pl. Dep. at 71.) Plaintiff also testified that Fortner told her he could not ask the Board for her raise because of the pending lawsuit. (Id. at 70.)

In contrast, Defendant contends, based on the testimony of Stewart, that Plaintiff was terminated as part of a staff reduction in an effort to cut costs. (Stewart Dep. at 8.) Specifically, Stewart testified that the Club probably had forty-five fewer golfing memberships in September of 2003 than the previous year and lost $80,000. (Id. at 52.) Audrey Unkel, the

6

accounting manager, supports Stewart's contention that membership was declining.  (Unkel

Dep. at 15.)  On the other hand, Fortner testified that membership was "really beginning to

move" and that Plaintiff brought in twenty-seven or twenty-eight new members.  (Fortner Dep.

at 33.)  Plaintiff and Fortner also contend that they were kicking off a marketing campaign

before she was terminated.  (Pl. Dep. at 98; Fortner Dep. Ex. 1)  Fortner testified that Plaintiff's

termination impacted the Club's ability to achieve its goals.  (Fortner Dep. at 31.)

Stewart maintains that he considered the food and beverage director, Cindy Holland, for

termination three weeks before he considered Plaintiff as well as the chef, Fred Scheeremberg,

both of whom were also fired. (Stewart Dep. at 9.)[6]  Stewart testified that when talking about

terminating Scheeremberg and Holland to reduce costs "[Fortner] said to me, I think I can

function without [Plaintiff] also.  I said, are you sure?  And he says, yes I'm sure.  I said, well,

then we need to do it."  (Stewart Dep. at 9.)[7]  Stewart maintains that terminating Plaintiff was

his decision, based on Fortner's recommendation.[8]  (Stewart Dep. at 9.)  He also testified that

he thinks Fortner was lying in his deposition because he is a disgruntled former employee.

(Stewart Dep. at 14.)

---

[6] Plaintiff confirms that Holland was terminated before her, because she and Fortner assumed the duties of her position.  (Pl. Dep. at 39.)

[7] Stewart stated that this conversation took place face to face, although, as noted above, Fortner stated that he called Stewart.  (Stewart Dep. at 10, Fortner Dep. at 25-26.)

[8] Stewart testified that he had the authority to terminate Plaintiff because the Board of Governors gave him the authority to fix the budget.  (Stewart Dep. at 10-11.)  He testified that he informed "some members of the executive committee" within 24 hours of his decision and "nobody took exception with it."  (Id. at 11.)  He concedes that he is "very vague" on the details of the meeting with the committee.  (Id.)

*Plaintiff's ERISA Claims*

Plaintiff also brings two claims pursuant to ERISA, a provision of which requires that a "Plan Administrator" provide a summary plan description within thirty days after a beneficiary's request.  On December 23, 2003, Plaintiff's counsel sent a letter to Stewart requesting a summary plan description, or in the alternative, the identity of the Plan Administrator.  (Def. Ex. P; Pl. Ex. E.)  Defendant's counsel allegedly did not provide a copy of the plan until November 12, 2004.  (Pl. Ex. B.)  The parties dispute whether Defendant was, in fact, the Plan Administrator at the time of Plaintiff's request.  Facts relevant to this dispute are discussed in detail below.

## II.    Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgement points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal

quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[9]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments.  *Beal*, 20 F.3d at 458-59.  If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial.  *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

### III.   Legal Analysis

A.    Count I - Retaliatory Discharge, Fla. Stat. § 440.205

Plaintiff and Defendant have filed cross motions for summary judgment on Count I of Plaintiff's First Amended Complaint, which alleges that Plaintiff was terminated in retaliation for filing a claim for workers' compensation benefits.  Section 440.205 of the Florida Statutes provides that "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any

---

[9] All decision of the Fifth Circuit issued prior to October 1, 1981 are binding precedent on courts within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law."  Fla. Stat. § 440.205 (2004).

1.    Direct Evidence

Direct evidence demonstrates discriminatory intent without inference or presumption. *Standard v. ABEL Serv., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Although no Florida cases have addressed whether direct evidence carries similar weight under the Florida workers' compensation retaliation statute, Florida and federal courts consistently apply Title VII law to such cases.  *See Russell v. KSL Hotel Corp.*, 887 So.2d 372, 379 (Fla. 3rd DCA 2004) (citing Eleventh Circuit cases for the elements of a circumstantial case); *Posada v. James Cello, Inc.*, 2005 WL 1390133, *2 (11th Cir. 2005) (applying Eleventh Circuit law); *Wilkerson v. Fla. Power & Light Co.*, 2002 WL 31553548, *4 (M.D. Fla. 2002) (same); *Humphrey v. Sears, Roebuck, and Co.*, 192 F. Supp. 2d 1371, 1374 (S.D. Fla. 2002) (same).  The Eleventh Circuit has "marked severe limits on the kind of language to be treated as direct evidence . . . ." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998).  Ultimately, language amounting to direct evidence must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus.  *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

There is little doubt that Fortner's numerous statements reveal a blatant illegal motive for Plaintiff's termination.  For statements of discriminatory intent to constitute direct evidence of discrimination, however, "they must be made by a person involved in the challenged decision." *Bass v. Board of County Comm'rs, Orange County*, 256 F.3d 1095, 1105 (11th Cir. 2001) (quoting *Trotter v. Bd. of Trustees of Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996)

10

*abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).  In the

instant case, Fortner's recommendation to Stewart, the President, carried significant weight: the

evidence shows that Fortner introduced the idea to Stewart and that Stewart did not previously

want to fire Plaintiff.  Under these circumstances, Fortner may properly be considered a

decisionmaker, and his unequivocal statements that Plaintiff was terminated for filing a

workers' compensation claim are direct evidence of discrimination.

If a plaintiff provides direct evidence of discriminatory intent, "then the employer must

prove by a preponderance of the evidence that the same employment decision would have been

made in the absence of the discriminatory intent."  *Standard*, 161 F.3d at 1330.  For the reasons

discussed below, the Court finds there is a factual question regarding whether the same

decision would have been made absent Fortner's reasons for executing Plaintiff's termination.

### 2.   Circumstantial Evidence

a.   Prima Facie Case

Plaintiff may also establish her claim through circumstantial evidence, although she

bears the initial burden of establishing a prima facie case showing that: (1) she engaged in

statutorily protected expression; (2) she suffered an adverse employment action; and (3) a

causal connection exists between her participation in the protected expression and the adverse

employment action.  *See Russell*, 887 So. 2d at 379 (noting that the elements necessary to prove

a prima facie case of workers' compensation retaliation and employment discrimination

retaliation are "essentially the same"); *Bell v. Ga.-Pac. Corp.*, 2005 WL 1163105, *9 (M.D.

Fla. 2005) (noting that the prima facie case is "essentially the same" as under the Florida

Whistleblower Act).  It is undisputed that Plaintiff filed a workers' compensation claim and

that she suffered an adverse employment action in the form of a termination. The parties dispute the causal connection.

The Court finds a sufficiently strong causal connection given Fortner's unequivocal testimony that Plaintiff was terminated because she filed a workers' compensation claim. The causal connection is not broken, as Defendant argues, by the time between the filing of Plaintiff's workers' compensation claim and her discharge. Plaintiff was fired only sixteen days after her workers' compensation was dismissed.

b.    Legitimate, Non-discriminatory Reasons and Pretext

Having proven her prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Defendant contends that the real reasons for Plaintiff's termination were the flagging membership numbers and associated budgetary problems. Specifically, Defendant presents evidence that two other employes were also terminated around the same time for this very reason.

Section 440.205, however, prohibits discharge brought about by an attempt to claim compensation, even if there may be other reasons for the discharge. *Allan v. SWF Gulf Coast, Inc.*, 535 So. 2d 638, 639 (Fla. 1st DCA 1988). Plaintiff presents strong evidence that the membership numbers were actually increasing and that she was contributing to the Club's growth. Coupled with Fortner's repeated statements that Plaintiff was terminated for filing a workers' compensation claim, the Court finds that Plaintiff has presented sufficient evidence to create a jury question as to the true reason for her termination. *See Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (noting that pretext may be proved directly "by

persuading the court that a discriminatory reason more likely motivated the employer" or proved indirectly "by showing that the employer's proffered explanation is unworthy of credence"). The parties' cross motions for summary judgment on Plaintiff' workers' compensation retaliation claim are accordingly denied.

B.    Count II - Retaliatory Discharge, Fla. Stat. § 448.102

Defendant moves for summary judgment on Plaintiff's claim under the Florida Whistleblower Act (FWA), which provides that "[a]n employer may not take any retaliatory personnel action against an employee because the employee has . . .[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3) (2004).

 In order to establish a prima facie case of retaliation under the FWA, Plaintiff must prove that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally linked to the statutorily protected activity. *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1336 (M.D. Fla. 2005) (citing *Sierminski v. Transouth Fin. Corp.,* 216 F.3d 945, 950 (11th Cir.2000); *Rice-Lamar v. City of Ft. Lauderdale,* 853 So.2d 1125, 1132 (Fla. 4th DCA 2003); *Taylor v. Memorial Health Sys., Inc.,* 770 So.2d 752, 754 (Fla. 5th DCA 2000).

As Plaintiff notes, section 446.102(3) requires an *actual* violation of a "law, rule, or regulation." *White*, 369 F. Supp. 2d at 1337-39 (finding that the plain language of the statute requires an actual violation before a burden-shifting analysis may take place). Plaintiff contends that Defendant violated section 29 U.S.C. § 654, which requires employers to "comply with occupational safety and health standards promulgated under this chapter." Even

assuming Plaintiff actually objected to or refused to participate in a violation,[10] Plaintiff fails to

identify how Defendant violated an occupational safety or health standard within the relevant

chapter.  Although Plaintiff contends that there was a mold problem in the building, she fails to

present any evidence that the condition of the Club actually violated any OSHA standard.

Defendant's motion for summary judgment on Plaintiff's claim under the Florida

Whistleblower Act is therefore granted.

### C.    Count III - 29 U.S.C. § 1132(c)(1)(B)

Both Plaintiff and Defendant move for summary judgment on Plaintiff's claim that

Defendant violated an ERISA statutory requirement by not timely complying with Plaintiff's

request for a copy of her summary plan description.  29 U.S.C. 1132(c)(1)(B) provides in

relevant part:

> Any administrator . . . who fails or refuses to comply with a request for any
> information which such administrator is required by this subchapter to furnish to
> a participant or beneficiary (unless such failure or refusal results from matters
> reasonably beyond the control of the administrator) by mailing the material
> requested to the last known address of the requesting participant or beneficiary
> within 30 days after such request may in the court's discretion be personally
> liable to such participant or beneficiary in the amount of up to $100 a day from
> the date of such failure or refusal, and the court may in its discretion order such
> other relief as it deems proper.

The issue central to this claim is the identity of the Administrator.  According to the Employee

Benefit Sumary Plan Description, Paychex Business Solutions, Inc. ("Paychex") -- not a party

to the instant action -- is the Administrator for Defendant's health insurance plan.  (Def. Ex. O

---

[10] Plaintiff's memorandum of law in opposition to Defendant's motion for summary
judgment baldly asserts that "Plaintiff opposed that cover-up by the environmental consultant
hired by Defendant."  Plaintiff cites to no record evidence indicating that Plaintiff actually
did anything to oppose Defendant's practices.

at 13.)  Plaintiff alleges, however, that at some point before or shortly after her termination,

Paychex ceased being the Administrator.  In a November 18, 2003 letter to Plaintiff Paychex

stated:

> The contractual relationship between Paychex Business Solutions and THE
> COUNTRY CLUB OF BREVARD has ceased as of 11/22/03.  Paychex
> Buisness Solutions is no longer considered your employer.[11]  However, our
> understanding is that THE COUNTY CLUB OF BREVARD will continue to
> employ you after this date.  (Pl. Ex. C.)

In a December 9, 2003 letter to Plaintiff, Paychex stated:

> The benefits for which you are eligible are fully explained in the 'Summary Plan
> Description.'  This was given to all employees when they first became eligible
> for employee health benefits.  If you need a copy of the 'Summary Plan
> Description', please call your prior employer.  (Pl. Ex. D.)

Plaintiff also states that even before she was fired, "it was my understanding that Paychex had

already been terminated or notified that they were going – we were going to be – the Country

Club was going to be bringing payroll back in-house and that they were going to be using

another medical insurance carrier . . . ."  (Pl. Dep. at 42-43.)

In the absence of a designated Administrator, the "plan sponsor" -- in this case

Defendant -- becomes the default Administrator.  *See* 29 U.S.C. § 1002(16)(A); 29 U.S.C. §

1002(16)(B).[12]  Plaintiff requested a copy of her summary plan description from Defendant in

December 2003, but allegedly did not receive a copy of the plan until November 2004.  If

---

[11] The parties do not explain why the letter refers to Paychex as Plaintiff's "employer."

[12] 29 U.S.C. § 1002(16)(A) defines "administrator" as:
(i) the person specifically so designated by the terms of the instrument under which the plan is operated;
(ii) if an administrator is not so designated, the plan sponsor; . . .
"Plan sponsor" is defined, in relevant part, as "the employer in the case of an employee benefit plan established or maintained by a single employer."  29 U.S.C. § 1002(16)(B).

Defendant was, in fact, the Administrator, this delay would far exceed the statutory thirty-day requirement in 29 U.S.C. 1132(c)(1)(B).  Given the confusion in the record evidence regarding the identity of the Administrator, however, the Court finds this is a disputed issue of material fact that precludes the parties' cross motions for summary judgment on Count III.

D.    Count IV - 29 U.S.C. § 1132(c)(1)(A)

Defendant also moves for summary judgment on Plaintiff's claim pursuant to 29 U.S.C. § 1132(c)(1)(A), which imposes liability on an Administrator who fails to meet the requirements of paragraph (1) or (4) of section 1166(1), section 1166(4), section 1021(e)(1) or section 1021(f).  The Court finds that Defendant violated none of these sections.

Section 1166(a)(1) requires a group health plan to provide "at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection."  It is undisputed that Paychex was the Administrator at the commencement of coverage under the plan, and as such, Defendant had not assumed any obligation as an Administrator.

Section 1166(a)(4) requires the Administrator to notify the beneficiary of her rights in the case of a "qualifying event" under section 1163, which includes a termination.  *See* 29 U.S.C. § 1163(2).  Although, again, Defendant was not the Administrator at the time of Plaintiff's termination, it is undisputed that Paychex sent the requisite notice on November 14, 2003, and that Plaintiff, in fact, elected to continue her coverage.[13]  (Exs. Q, R, & S.)

---

[13]On November 14, 2003, PayChex sent a letter to Plaintiff advising her of her COBRA benefits.  (Def. Ex. Q.)  Plaintiff signed the Group Health Benefits Continuation of Coverage Election Form on November 22, 2003, and requested enrollment in the health benefits continuation plan on December 1, 2003.  (Def. Exs. R, S.)

Section 1021(e)(1), which requires an Administrator to notify participants and beneficiaries of transfers of excess pensions assets to a health benefits account, and section 1021(f), which governs funding notices for multiemployer defined benefit plans, are both inapplicable to the instant case.  The Court accordingly grants Defendant's motion for summary judgment on Count IV.

## IV.   Conclusion

It is  **ORDERED** as follows:

(1) Defendant's Motion for Summary Judgment (Doc. 36) is GRANTED IN PART as to Count II and Count IV and DENIED IN PART as to Count I and Count III.

(2) Plaintiff's Partial Motion for Summary Judgment (Doc. 45) is DENIED.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 1, 2005.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE